**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PHARMACISTS MUTUAL INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | Case No.: 20-cv-1455 |
| v. | ) ) | |
| CAREPOINT HEALTHCARE LLC, CAREPOINT OHIO LLC, CAREPOINT GEORGIA LLC, CAREPOINT TEXAS LLC, CAREPOINT INDIANA LLC, CAREPOINT, INC. | ) ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT FOR DECLARATORY JUDGMENT

NOW COMES Plaintiff, Pharmacists Mutual Insurance Company ("PhMIC"), by and through its undersigned counsel, and herein submits its Complaint for Declaratory Judgment against Defendants, Carepoint Healthcare, LLC ("Carepoint Healthcare"), Carepoint Georgia, LLC ("Carepoint Georgia"), Carepoint Indiana, LLC ("Carepoint Indiana"), Carepoint Ohio, LLC ("Carepoint Ohio"), Carepoint Texas, LLC ("Carepoint Texas") (collectively, the "Carepoint Entities"), and Carepoint, Inc.  PhMIC seeks a declaration by the Court that there is no coverage under any of the policies issued by PhMIC to the Carepoint Entities[1] for the claims asserted in the enclosed Trademark Complaint (Exhibit 11, hereto).  In support thereof, PhMIC alleges as follows:

## PARTIES

1.    PhMIC is an insurance company with its principal place of business in Algona, Iowa.

---

[1] This Complaint addresses coverage regarding each of the defendants named in the Trademark Complaint, except Carepoint Florida, LLC ("Carepoint Florida").  Carepoint Florida was issued separate commercial policies.  Thus, coverage for that entity is being addressed separately.

2560126

2.      Carepoint Healthcare is an Illinois limited liability company with its principal place of business in Schaumburg, Illinois.

3.      Carepoint Georgia is a Georgia limited liability company with its principal place of business in Suwanee, Georgia.

4.      Carepoint Indiana is an Indiana limited liability company with its principal place of business in Indianapolis, Indiana.

5.      Carepoint Ohio is an Ohio limited liability company with its principal place of business in Lewis Center, Ohio.

6.      Carepoint Texas is a Texas limited liability company with its principal place of business in Houston, Texas.

7.      Carepoint Inc. is a South Carolina corporation with its principal place of business in Charleston, South Carolina.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this matter under 28 U.S.C. §1332(a)(1) because there is complete diversity of citizenship between PhMIC, on the one hand, and Defendants, on the other hand, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.      Venue is proper under 28 U.S.C. §1391(b)(2) because the insurance policy that is the subject of this claim was issued in the Northern District of Illinois, and thus a substantial part of the events or omissions giving rise to this claim occurred in the Northern District of Illinois.

10.     Pursuant to 28 U.S.C. §2201 and Federal Rule of Civil Procedure 57, this Court has authority to declare the rights and obligations of the parties in relation to the terms and provisions of the policies of insurance that PhMIC issued to Carepoint Healthcare.

## THE PhMIC POLICIES

11.     PhMIC issued eight Business Owners insurance policies to Carepoint Healthcare which contained Commercial General Liability ("CGL") coverage parts, written on an "occurrence" basis, as follows: (1) Policy No. BOP 0125516 00 for the period of September 4, 2012 to September 4, 2013 (the "2012-2013 Policy"); (2) Policy No. BOP 0125516 01 for the period of September 4, 2013 to September 4, 2014 (the "2013-2014 Policy"); (3) Policy No. BOP 0125516 02 for the period of September 4, 2014 to September 4, 2015 (the "2014-2015 Policy"); (4) Policy No. BOP 0125516 03 for the period of September 4, 2015 to September 4, 2016 (the "2015-2016 Policy"); (5) Policy No. BOP 0125516 04 for the period of September 4, 2016 to September 4, 2017 (the "2016-2017 Policy"); (6) Policy No. BOP 0125516 05 for the period of September 4, 2017 to September 4, 2018 (the "2017-2018 Policy"); (7) Policy No. BOP 0125516 06 for the period of September 4, 2018 to September 4, 2019 (the "2018-2019 Policy"); and (8) Policy No. BOP 0125516 07 for the period of September 4, 2019 to September 4, 2020 (the "2019-2020 Policy") (collectively, the "Commercial Policies").  Copies of the Commercial Policies are attached hereto as Exhibits 1 through 8, respectively, and are incorporated herein by reference.

12.     Commencing on September 4, 2016 each of the Commercial Policies contained a "Cyber Endorsement."  That "Cyber part" was and is written on a "Claims Made" basis.  Thus, the only potential for coverage under the Cyber part is the current policy effective at the time the claim (the Trademark Lawsuit) was first made in September 2019.

13.     PhMIC also issued two Commercial Excess/Umbrella Liability policies to Carepoint Healthcare: (1) Policy No. UCL 0162244 00 for the period of April 30, 2019 to September 4, 2019 (the "2019 Umbrella Policy"); and (2) Policy No. UCL 0162244 01 for the period of September 4, 2019 to September 4, 2020 (the "2020 Umbrella Policy") (collectively,

the "Umbrella Policies"). The 2019 Umbrella Policy is attached hereto as Exhibit 9, and a copy of the 2020 Umbrella Policy is attached hereto as Exhibit 10. The Umbrella policies are incorporated herein by reference.

**A.     The Commercial Policies**

14.     PhMIC issued the 2012-2013 Policy to Carepoint Healthcare as the sole Named Insured. Thereafter, Carepoint Georgia and Carepoint Texas were added as Additional Named Insureds beginning with the 2015-2016 Policy, and Carepoint Ohio and Carepoint Indiana were added as Additional Named Insureds beginning with the 2016-2017 Policy. All coverage terms, conditions, definitions, and exclusions apply with equal force to each of the Carepoint Entities at any time they have been insured under the Commercial Policies.

15.     The Commercial Policies utilize one of three Commercial Liability Coverage Forms: BP0200 01 04, BP0200 06 12, or BP0200 06 17. For purposes of this action, each of the commercial liability coverage forms in the Commercial Policies contains substantially similar terms, conditions, definitions, and exclusions. Thus, any terms, conditions, definitions, and exclusions of the Commercial Policies cited herein refer to the corresponding terms, conditions, definitions, and exclusions in each of the Commercial Policies, which may have minor wording differences and/or may appear under different numbered and/or lettered sections.[2]

16.     Coverage L of the Commercial Policies provides, in relevant part, as follows:[3]

**COMMERCIAL LIABILITY COVERAGES**
**COVERAGE L – BODILY INJURY LIABILITY AND PROPERTY DAMAGE LIABILITY**
1.  Insuring Agreement
    a.  "We" pay those sums which an "insured" becomes legally obligated to pay as "damages" due to "bodily injury" or "property damage" to which this insurance applies. "We" have the right and duty to defend the

---

[2] The quotations herein refer to commercial liability coverage form BP0200 06 17.
[3] *See* BP 0200 01 04, pp. 48-49; BP 0200 06 12, pp. 49-50; BP 0200 06 17, pp. 51-52.

"insured" against a "suit" seeking "damages" which may be covered under the Commercial Liability Coverage.

However, "we" have no duty to defend the "insured" against a "suit" seeking "damages" arising out of "bodily injury" or "property damage" to which this policy does not apply.

\*\*\*

e.  This insurance applies only to "bodily injury" or "property damage":
1) caused by an "occurrence" which takes place in the "coverage territory";
2) which occurs during the policy period…

\*\*\*

2.  Exclusions

\*\*\*

d.  "We" do not pay for "bodily injury" or "property damage":
1) which is expected by, directed by, or intended by the "insured"; or
2) that is the result of intentional and malicious acts of the "insured".

However, this exclusion does not apply to "bodily injury" arising out of the use of reasonable force to protect people or property.

17.  Coverage P of the Commercial Policies provides, in relevant part, as follows:[4]

**COVERAGE P – PERSONAL AND ADVERTISING INJURY LIABILITY**

1.  Insuring Agreement
a.  "We" pay those sums which an "insured" becomes legally obligated to pay as "damages" due to "personal and advertising injury" to which this insurance applies.  "We" have the right and duty to defend the "insured" against a "suit" seeking "damages" which may be covered under the Commercial Liability Coverage.

However, "we" have no duty to defend the "insured" against a "suit" seeking "damages" arising out of "personal and advertising injury" to which this policy does not apply.  "We" may investigate offenses and settle claims or "suits" that "we" decide are appropriate.

\*\*\*

e.  "We" cover "personal and advertising injury" arising out of an offense committed in the course of "your" business, if the offense was committed:
1) within the "coverage territory"; and
2) during the policy period.

\*\*\*

2.  Exclusions

\*\*\*

---

[4] *See* BP 0200 01 04, p. 56; BP 0200 06 12, p. 58; BP 0200 06 17, p. 60.

d.  "We" do not pay for "personal and advertising injury" arising out of an act committed by or directed by the "insured" who knew that "personal and advertising injury" would occur as a result of the act.

\*\*\*

g.  "We" do not pay for "personal and advertising injury" arising out of:

   1)  oral or written publication of material done by or at the direction of the "insured" who knew that it was false; or

   2)  oral or written publication of material that took place prior to the policy period.

\*\*\*

m.  "We" do not pay for "personal and advertising injury" arising out of any violation of intellectual property rights, including infringement of trademark, trade-secret, or patent rights or copyright. With respect to this exclusion, intellectual property rights do not include using the advertising ideas of others in "your" "advertisement".

   However, this exclusion does not apply to a violation or infringement of copyright, slogan, or trade-dress rights that occur in your "advertisement".

\*\*\*

o.  "We" do not pay for "personal and advertising injury" arising out of using, without permission, the name or product of others on "your" web site, in "your" e-mail address, domain name, or metatags for the purpose of misleading the potential customers of another.

18.  The Commercial Policies contain the following relevant definitions:[5]

1.  "Advertisement" means a public notice or announcement, including but not limited to one found in electronic communication or on the Internet, offering "your" goods, products, or services:

   a.  for sale, rent, lease, or other purpose to potential buyers, clients, customers, or patrons; or

   b.  for promotion to and consideration by potential supporters.

3.  "Bodily injury" means bodily harm, sickness, or disease sustained by a person.  "Bodily injury" includes death that results at any time from bodily harm, sickness, or disease.

   However, "bodily injury" does not include mental or emotional injury, suffering, or
   distress that does not result from a physical injury.

\*\*\*

6.  "Damages" means compensation in the form of money for a person or organization who claims to have suffered an injury.

\*\*\*

---

[5] *See* BP 0200 01 04, pp. 41-42, 45-47; BP 0200 06 12, pp. 42, 44, 46-47, 48; BP 0200 06 17, pp. 44, 46, 48-50.

16. "Occurrence" means an accident and includes continuous or repeated exposure to similar conditions.

\*\*\*

17. "Personal and advertising injury" means injury, including "bodily injury" that is a consequence thereof, arising out of one or more of the following offenses:

   a.  oral or written publication, including electronic publication, of material that:

      1) slanders or libels a person or organization;

      2) disparages a person's or an organization's goods, products, or services; or

      3) violates a person's right of privacy;

   b.  false arrest, detention, or imprisonment;

   c.  malicious prosecution;

   d.  misappropriation of advertising ideas of another in "your" "advertisement";

   e.  infringement of the copyright, slogan, or trade-dress of another in "your" "advertisement"; or

   f.  wrongful entry into, wrongful eviction from, or invasion of the right of private occupancy of a room, dwelling, or premises that a person occupies. This offense must be committed by or on behalf of the owner, landlord, or lessor of the room, dwelling, or premises.

\*\*\*

20. "Property damage" means:

   a.  physical injury or destruction of tangible property, including loss of use of that property. Loss of use is deemed to occur at the time of the physical injury that caused it; or

   b.  the loss of use of tangible property that has not been physically damaged. Loss of use is deemed to occur at the time of the "occurrence" that caused it.

With respect to the Commercial Liability Coverages, "data records" are not tangible property.

19.    The Commercial Policies also contain a Punitive Damages Exclusion Endorsement, which provides:[6]

### PUNITIVE DAMAGES EXCLUSION

The Commercial Liability Coverages are amended as follows:

This policy does not apply to a claim or indemnification for punitive or exemplary "damages", or to any costs, attorney fees, interest, or "damages" attributable to an award of punitive or exemplary "damages." Punitive or exemplary "damages"

---

[6] *See* BP 0722 02 04; BP 0722 12 10.

means those "damages" imposed to punish a wrongdoer and to deter others from similar conduct.

However, if a "suit" seeking both compensatory "damages" and punitive or exemplary "damages" is brought against an "insured" for an "occurrence" or offense covered by this policy, "we" will provide defense coverage.

**B.     The Umbrella Policies**

20.     PhMIC issued the Umbrella Policies to Carepoint Healthcare, with Carepoint Georgia, Carepoint Texas, Carepoint Ohio, and Carepoint Indiana being added as Additional Named Insureds.

21.     The Umbrella Policies utilize the same Commercial Excess/Umbrella Liability coverage form CU 0001 09 10.   Thus, all references to terms, conditions, definitions and exclusions of the Umbrella Policies herein refer to the corresponding terms, conditions, definitions, and exclusions in each of the Umbrella Policies.

22.     Coverage E of the Umbrella Policies provides, in relevant part, as follows:[7]

**COVERAGE E – EXCESS LIABILITY**
1. Insuring Agreement
   a. "We" will pay on behalf of the "insured" those sums in excess of "underlying insurance" for which an "insured" becomes legally obligated to pay as "damages" to which this insurance applies.
   \*\*\*
   d. This insurance applies only to:
      1) "bodily injury" or "property damage" that:
         a) is caused by an "occurrence" that takes place in the "coverage territory";
         b) occurs during the policy period of this policy; and
         \*\*\*
         d) is covered by "underlying insurance" or that would have been covered by "underlying insurance" but for the exhaustion of "underlying insurance" "limits" by the payment of claims, settlements, judgments, and/or defense costs.
      2) "personal and advertising injury" that:
         a) arises out of an offense committed in the course of "your" business if the offense is committed:
            (1) within the "coverage territory"; and,

---

[7] *See* CU 0001 09 10, pp. 9-10, 13.

(2) during the policy period of this policy; and
 b) is covered by "underlying insurance" or that would have been covered by "underlying insurance" but for the exhaustion of "underlying insurance" "limits" by the payment of claims, settlements, or judgments; and

3) any other injury or damage that:
 a) arises out of a negligent act, error, omission, injury, event, incident, or offense; and
 b) is covered by "underlying insurance" or that would have been covered by "underlying insurance" but for the exhaustion of "underlying insurance" "limits" by the payment of claims, settlements, judgments, and/or defense costs;

\*\*\*

2. Exclusions
"We" do not pay for:
 a. Injury or damage that is not covered by "underlying insurance" for any reason other than exhaustion of its "limit".

23. Coverage U of the Umbrella Policies provides, in relevant part, as follows:[8]

## COVERAGE U – UMBRELLA LIABILITY

1. Insuring Agreement
 a. "We" will pay on behalf of the "insured" those sums in excess of:
  1) the "self-insured retention"; or
  2) other insurance, excluding insurance specifically purchased by the "insured" to apply in excess of the insurance afforded by this policy, which is available to the "insured" and provides coverage with respect to injury or damage to which this policy applies;

 whichever is applicable, for which an "insured" becomes legally obligated to pay as "damages" because of "bodily injury", "property damage", or "personal and advertising injury" to which this insurance applies.

\*\*\*

 d. This insurance applies only to "bodily injury" or "property damage" that:
  1) is caused by an "occurrence" that takes place in the "coverage territory";
  2) occurs during the policy period of this policy; and

\*\*\*

 e. This insurance also applies to "personal and advertising injury" arising out of an offense committed in the course of "your" business, if the offense is committed:
  1) within the "coverage territory"; and
  2) during the policy period of this policy.

\*\*\*

2. Exclusions

---

[8] *See* CU 0001 09 10, pp. 17-23.

"We" do not pay for:

a. "bodily injury" or "property damage":

   1) that is expected by, directed by, or intended by the "insured"; or

   2) which is the result of intentional and malicious acts of the "insured".

However, this exclusion does not apply to "bodily injury" that arises out of the use of reasonable force to protect people or property.

\*\*\*

aa. "personal and advertising injury" arising out of an act committed by or directed by the "insured" who knew that "personal and advertising injury" would occur as a result of the act.

\*\*\*

cc. "personal and advertising injury" arising out of:

   1) oral or written publication of material done by or at the direction of the "insured" who knew it was false; or

   2) oral or written publication of material that took place prior to the beginning of the policy period.

\*\*\*

ii. "personal and advertising injury" arising out of any violation of intellectual property rights, including infringement of trademark, trade-secret, or patent rights or copyright. With respect to this exclusion, intellectual property rights do not include using the advertising ideas of others in "your" "advertisement".

However, this exclusion does not apply to a violation or infringement of copyright, slogan, or trade-dress rights that occur in "your" "advertisement".

\*\*\*

kk. "personal and advertising injury" arising out of using, without permission, the name or product of others on "your" website or in "your" e-mail address, domain name, or metatags for the purpose of misleading the potential customers of another.

24. The Umbrella Policies contain the following relevant definitions:[9]

3. "Advertisement" means a public notice or announcement, including but not limited to one found in electronic communication or on the Internet, offering "your" goods, products, or services:

a. for sale, rent, lease, or other purpose to potential buyers, clients, customers, or patrons; or

b. for promotion to and consideration by potential supporters.

With respect to "advertisements" that appear on websites, only that part of a website that offers "your" goods, products, or services:

---

[9] *See* CU 0001 09 10, pp. 2-9.

    a.  for sale, rent, lease, or other purpose to potential buyers, clients, customers, or patrons; or

    b.  for promotion to and consideration by potential supporters;

is considered an "advertisement".

\*\*\*

5.  "Bodily injury" means bodily harm, sickness, or disease sustained by a person. "Bodily injury" includes death that results at any time from bodily harm, sickness, or disease.

However, "bodily injury" does not include mental or emotional injury, suffering, or distress that does not result from physical injury, sickness, or disease.

\*\*\*

9.  "Damages" means compensation in the form of money for a person or organization who claims to have suffered an injury.

\*\*\*

22.  "Occurrence" means an accident and includes continuous or repeated exposures to similar conditions.

23.  "Personal and advertising injury" means injury, including "bodily injury" that is a consequence thereof, arising out of one or more of the following offenses:

    a.  oral or written publication, including electronic publication, of material that:

        1)  slanders or libels a person or organization;

        2)  disparages a person's or organization's goods, products, or servicers; or

        3)  violates a person's right of privacy.

    b.  false arrest, detention, or imprisonment;

    c.  malicious prosecution;

    d.  misappropriation of advertising ideas in "your" advertisement";

    e.  infringement of the copyright, slogan, or trade-dress of another in "your" "advertisement"; or

    f.  wrongful entry into, wrongful eviction from, or invasion of the right of private occupancy of a room, dwelling, or premises that a person occupies. This offense must be committed by or on behalf of the owner, landlord, or lessor of the room, dwelling, or premises.

\*\*\*

27.  "Property damage" –

    a.  "Property damage" means:

        1)  physical injury to or destruction of tangible property, including loss of use of that property. Loss of use is deemed to occur at the time of the physical injury that caused it; or

        2)  the loss of use of tangible property that has not been physically damaged. Loss of use is deemed to occur at the time of the "occurrence" that caused it.

Except with respect to coverage provided for "autos" under Coverage E, "data records" are not tangible property.

b.  With respect to the ownership, maintenance, or use of "autos" covered under Coverage E, "property damage" also includes any loss, cost, or expense arising out of any:
    1)  request, demand, order, statute, or regulation requiring that any "insured" or others test for, abate, monitor, clean up, remove, contain, treat, detoxify, neutralize, or in any way respond to or assess the effects of "pollutants"; or
    2)  claim or "suit" by or on behalf of any governmental authority relating to testing for, abating, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, or in any way responding to or assessing the effects of "pollutants".

34.  "Underlying insurance" means the liability insurance coverage provided under policies shown in the Schedule of Underlying Insurance on the "declarations" for the "limits" and policy periods indicated.  This includes any policies issued to replace those policies during the term of this insurance that:
    a.  provide at least the same "limits"; and
    b.  provide the same hazards insured against, except as modified by general program revisions or as agreed to by "us" in writing.

## 3.  The Cyber Liability Endorsements

25.    The Commercial Policies contain Cyber Liability Endorsements on the 2016-2017 Policy and each policy thereafter (collectively, the "Cyber Endorsements").

26.    The 2016-2017 Policy contains a Cyber Liability Endorsement with an Endorsement Period of September 4, 2016 to September 4, 2017, and a Retroactive Date of September 4, 2016 (the "2016-2017 Cyber Endorsement.")

27.    The 2017-2018 Policy contains a Cyber Liability Endorsement with an Endorsement Period of September 4, 2017 to September 4, 2018, and a Retroactive Date of September 4, 2016 (the "2017-2018 Cyber Endorsement.")

28.    The 2018-2019 Policy contains a Cyber Liability Endorsement with an Endorsement Period of September 4, 2018 to September 4, 2019, and a Retroactive Date of September 4, 2016 (the "2018-2019 Cyber Endorsement.")

29.     The 2019-2020 Policy contains a Cyber Liability Endorsement with an Endorsement Period of September 4, 2019 to September 4, 2020, and a Retroactive Date of September 4, 2016 (the "2019-2020 Cyber Endorsement.")

30.     The Cyber Endorsements are claims-made and reported coverages that extend defense and indemnity coverage for third-party liability under the following coverage agreements: (1) Coverage Agreement A – Multimedia Liability; (2) Coverage Agreement B - Security and Privacy Liability Coverage; (3) Coverage Agreement C - Privacy Regulatory Defense and Penalties Coverage; and (4) Coverage Agreement I – PCI DSS Assessment Coverage.

31.     Each of the Cyber Endorsements utilize one of two cyber liability coverage forms: PM 1184-IL 0615 or PM 1184-IL 0617.  For purposes of this action, each of the cyber liability coverage forms contains substantially similar terms, conditions, definitions, and exclusions. Thus, any terms, conditions, definitions, and exclusions of the Cyber Endorsements cited in this letter refer to the corresponding terms, conditions, definitions, and exclusions in each of the Cyber Endorsements, which may have minor wording differences and/or may appear under different numbered and/or lettered sections.[10]

32.     The Cyber Endorsements provide, in relevant part, as follows:[11]

A.     MULTIMEDIA LIABILITY COVERAGE
"We" will pay:
(1) "Damages" which an "insured" becomes legally obligated to pay; and
(2) "Defense costs",

Resulting from a "claim" for an actual or alleged "multimedia peril(s)" provided that:

(1) Such "claim" is first made against the "insured" during the "endorsement period";

---

[10] The quotations herein refer to cyber liability coverage form PM 1184-IL 0617.
[11] *See* PM 1184-IL 0615, pp. 1-2, 4; PM 1184-IL 0617, pp. 1-2, 4.

(2) The "insured" reports such "claim" in writing to "us" no later than sixty (60) days after the "claim" is first made against the "insured"; and
(3) The "multimedia peril(s)" takes place or first commences on or after the "retroactive date".

B.   SECURITY AND PRIVACY LIABILITY COVERAGE
"We" will pay:
(1)      "Damages" which an "insured" becomes legally obligated to pay; and
(2)      "Defense costs",

Resulting from a "claim" for an actual or alleged "security and privacy wrongful act" provided that:

(1)      Such "claim" is first made against the "insured" during the "endorsement period";
(2)      The "insured" reports such "claim" in writing to "us" no later than sixty (60) days after the "claim" is first made against the "insured"; and
(3)       The "security and privacy wrongful act" takes place or first commences on or after the "retroactive date".

C.   PRIVACY REGULATORY DEFENSE AND PENALTIES COVERAGE
"We" will pay:
(1)      "Regulatory fines and penalties" and/or any "regulatory compensatory award" which an "insured" becomes legally obligated to pay; and
(2)      "Defense costs",

Resulting from a "claim" for an actual or alleged "security breach" or "privacy breach", provided that:

(1)      Such "claim" is first made against the "insured" during the "endorsement period";
(2)      The "insured" reports such "claim" in writing to "us" no later than sixty (60) days after the "claim" is first made against the "insured"; and
(3)      The "security breach" or "privacy breach" takes place or first commences on or after the "retroactive date".

***

I.   PCI DSS ASSESSMENT COVERAGE
"We" will pay:
(1)      A "PCI DSS assessment" which an "insured" becomes legally obligated to pay; and
(2)      "Defense costs",

Resulting from a "claim" for an actual or alleged "security breach" or "privacy breach", provided that:

    (1)    Such "claim" is first made against the "insured" during the "endorsement period";

    (2)    The "insured" reports the "claim" in writing to "us" no later than sixty (60) days after the "claim" is first made against the "insured"; and

    (3)    The entirety of the "security breach" or "privacy breach" takes places or first commences on or after the "retroactive date".

33.    The Cyber Endorsements contain the following relevant exclusions:[12]

**SECTION III – EXCLUSIONS**

The insurance provided under this Endorsement does not apply to:

A.    Any "claim" based upon, arising out of, resulting from, in consequence of, or in any way involving any "multimedia peril", "security and privacy wrongful act", "security breach", "privacy breach", "covered cause of loss", "cyber extortion threat", "act of cyber terrorism", "adverse media report", or "notification":

    (1)    Which was the subject of written notice given to "us" or to any other insurer prior to the effective date of this Cyber Liability coverage;

    (2)    Which was the subject of any prior and/or pending written demand made against an "insured", or a civil, administrative or arbitration proceeding commenced against an "insured", prior to the effective date of this Cyber Liability coverage, or that involved the same or substantially the same fact, circumstance, or situation underlying or alleged in such prior demand or proceeding; or

    (3)    Which an "insured" had knowledge of prior to the initial effective date of this Cyber Liability coverage.

\* \* \*

H.    Any "claim" for unfair competition, price fixing, deceptive trade practices, restraint of trade, or violation of any anti-trust laws.

\* \* \*

P.    Any "claim" based upon, arising out of, resulting from, in consequence of, or in any way involving:

    (1)    Any actual or alleged "multimedia peril", "security and privacy wrongful act", "security breach", "privacy breach", "covered cause of loss", "cyber extortion threat", "act of cyber terrorism", or "adverse media report" that took place or first commenced prior to the "retroactive date"; or

    (2)    Any actual or alleged "multimedia peril", "security and privacy wrongful act", "security breach", "privacy breach", "covered cause of loss", "cyber extortion threat", "act of cyber terrorism", or

---

[12] *See* PM 1184-IL 0615, p. 5-7; PM 1184-IL 0617, pp. 5-7.

"adverse media report" that took place on or after the "retroactive date", which, together with an actual or alleged "multimedia peril", "security and privacy wrongful act", "security breach", "privacy breach", "covered cause of loss", "cyber extortion threat", "act of cyber terrorism", or "adverse media report" that took place prior to the "retroactive date", would constitute related "multimedia perils", "security and privacy wrongful acts", "security breaches", "privacy breaches", "covered causes of loss", "cyber extortion threats", "acts of cyber terrorism", or "adverse media reports".

For purposes of this exclusion, "multimedia perils", "security and privacy wrongful acts", "security breaches", "privacy breaches", "covered causes of loss", "cyber extortion threats", "acts of cyber terrorism", or "adverse media reports" will be deemed related if "we" determine that they are logically or causally connected by any common fact, circumstance, situation, event, transaction or series of facts, circumstances, situations, events or transactions.

34.     The Cyber Endorsements contain the following relevant definitions:[13]

C.      "Acquiring bank" means a bank or financial institution that accepts credit and/or debit card payments (including credit cards, debits cards, stored value cards and pre-paid cards) for products or services on behalf of a merchant, including processing and crediting those payments to a merchant's account.

\*\*\*

I.      "Card association" means Visa International, Mastercard, Discover, JCB American Express and any similar credit or debit card association that is a participating organization of the Payment Card Industry Security Standards Council.

\*\*\*

J.      "Claim" means:

(1)     With respect to Coverage Agreement A (Multimedia Liability) and Coverage Agreement B (Security and Privacy Liability):

(a)     Any written demand for monetary or non-monetary relief made against an "insured";

(b)     Any civil proceeding or arbitration proceeding initiated against an "insured", commenced by the service of a complaint or similar pleading or notice; or

(c)     Any written request to toll or waive a statute of limitations relating to a potential "claim" against an "insured", including any appeal therefrom;

---

[13] *See* PM 1184-IL 0615, p. 12-14, 16-21; PM 1184-IL 0617, p. 11-12, 14-19.

- 16 -

A "claim" under Coverage Agreement A or Coverage Agreement B will be deemed to be first made when an "insured" first receives notice of any of (1)(a) through (1)(c) above.

\*\*\*

(8)    With respect to Coverage Agreement I (PCI DSS Assessment Coverage), any written demand made against an "insured" by an "acquiring bank" or "card association" for a "PCI DSS assessment" due to the "insureds" non-compliance with "PCI Data Security Standards". A "claim" under Coverage Agreement I will be deemed to be first made when such written demand is received by an "insured".

\*\*\*

U.    "Damages" means the amount of money which an "insured" is legally obligated to pay as a result of a covered "claim" under Coverage Agreement A or Coverage Agreement B, including judgments, legal fees and costs awarded against an "insured" pursuant to such judgments, and settlements negotiated with the Company consent.

"Damages" does not include:

(1)    Taxes;

(2)    Any amount for which an "insured" is absolved from legal responsibility to make payment to a third party;

(3)    Amounts owed under contract, except liability **assumed under contract**;

(4)    "Your" future profits or royalties or any return, withdrawal, restitution, or reduction of "your" professional fees, profits or other charges;

(5)    Punitive, liquidated or exemplary damages or the multiplied portion of multiplied damages;

(6)    Fines, sanctions or penalties;

(7)    Any matters that are deemed uninsurable under applicable law;

(8)    The costs to comply with orders granting injunctive or non-monetary relief, including specific performance or any agreement to provide such relief;

(9)    Disgorgement of any remuneration or financial advantage to which "you" were not legally entitled; or

(10)    Settlements negotiated without "our" consent.

\*\*\*

EE.    "Government investigation" means a formal investigation instituted against an "insured" by any federal, state or local government agency or authority, the subject matter of which is a "security breach" or "privacy breach".

\*\*\*

LL.    "Multimedia peril" means the release or display of any "electronic media" on "your" "internet" site or "print media" for which "you" are solely responsible, which directly results in any of the following:

- 17 -

(1)    Any form of defamation or other tort related to the disparagement or harm to the reputation or character of any person or organization, including libel, slander, product disparagement, or trade libel,

(2)    Invasion, infringement or interference with an individual's right of privacy including false light, intrusion upon seclusion, commercial misappropriation of name, person, or likeness, and public disclosure of private facts;

(3)    Plagiarism, piracy, or misappropriation of ideas under an implied contract;

(4)    Infringement of copyright, trademark, trade name, trade dress, title, slogan, service mark or service name; or

(5)    Domain name infringement or improper deep-linking or framing.

\*\*\*

RR.    "PCI Data Security Standards" (known as "PCI DSS") means the published data security standards in effect now, or as hereafter amended, which all merchants and processors must follow when storing, processing and transmitting cardholder data.

\*\*\*

SS.    "PCI DSS assessment" means a monetary fine or penalty assessed against an "insured" by an "acquiring bank" or "card association" because of a "security breach" or "privacy breach".

\*\*\*

WW.    "Privacy breach" means any of the below, whether actual or alleged, but only if committed or allegedly committed by "you" or by others acting on "your" behalf for whom "you" are legally responsible, including "BPO service providers" and "outsourced IT service providers":

(1)    A common law breach of confidentiality, infringement, or violation of any right to privacy, including, but not limited to, a breach of "your" privacy policy, false light, intrusion upon a person's seclusion, commercial misappropriation of name, person, or likeness, or public disclosure of a person' s private information; or

(2)    Any breach of privacy regulations, as they currently exist and as amended, associated with the confidentiality, access, control, and use of personally identifiable, non-public information, including, but not limited to:

(a)    Health Insurance Portability and Accountability Act of 1996 (Public Law 104- 191), known as HIPAA, and related state medical privacy laws;

(b)    Gramm-Leach-Bliley Act of 1999 (G-L-B), also known as the Financial Services Modernization Act of 1999;

(c)    State and federal statutes and regulations regarding the security and privacy of consumer information;

(d)    Governmental privacy protection regulations or laws associated with the control and use of personal information;

(e)    Privacy provisions of consumer protection laws, including the Federal Fair Credit Reporting Act (FCRA) and similar state laws;

(f)    The Health Information Technology for Economic and Clinical Health Act ("HITECH"), Title XIII of the American Recovery and Reinvestment Act ("ARRA") of 2009.

A series of continuing "privacy breaches" or related or repeated "privacy breaches" will be considered a single "privacy breach" and will be deemed to have occurred when the first of such "privacy breaches" occurred.

***

EEE.    "Security and privacy wrongful act" means any of the following acts, whether actual or alleged, but only if committed or allegedly committed by an "insured":

(1)    Failure to prevent or hinder a "security breach" that in turn results in:

(a)    The alteration, copying, corruption, destruction, deletion, or damage to electronic "data" stored on an "insured computer system";

(b)    Theft, loss or unauthorized disclosure of electronic and non-electronic confidential commercial, corporate, personally identifiable, or private information that is in "your" care, custody or control;

(c)    Theft, loss, or unauthorized disclosure of electronic and non-electronic confidential commercial, corporate, personally identifiable, or private information that is in the care, custody or control of a "BPO service provider" or "outsourced IT service provider" that is holding, processing, or transferring such information on "your" behalf; provided, however, that the theft, loss or unauthorized disclosure occurs while "your" written contract with such "BPO service provider" or "outsourced IT service provider" is in effect; or

(d)    "Unauthorized use" of, or "unauthorized access" to, a "computer system" other than an "insured computer system".

(2)    Failure to timely disclose a "security breach" affecting personally identifiable, nonpublic information or the failure to dispose of personally identifiable, nonpublic information within the required period, in violation of privacy regulations in effect now or in the future;

(3)    Failure to prevent the transmission of "malicious code" or "computer virus" from an "insured computer system" to the "computer system" of a third party;

(4)    A "privacy breach";

(5)     Failure to prevent or hinder participation by an "insured computer system" in a "denial of service attack" directed against "internet" sites or the "computer system" of any third party; or

(6) Loss of employee information.

***

FFF.     "Security breach" means:

(1)     "Unauthorized access" to, or "unauthorized use" of, an "insured computer system", including "unauthorized access" or "unauthorized use" resulting from the theft of a password from an "insured computer system" or from any "insured";

(2)     A "denial of service attack" against an "insured computer system"; or

(3)     Infection of an "insured computer system" by "malicious code" or the transmission of "malicious code" from an "insured computer system",

whether any of the foregoing is a specifically targeted attack or a generally distributed attack. A series of continuing "security breaches", related or repeated "security breaches", or multiple "security breaches" resulting from a continuing failure of computer security will be considered a single "security breach" and will be deemed to have occurred when the first of such "security breaches" occurred.

## THE TRADEMARK LAWSUIT

35.     On September 25, 2019, Carepoint, Inc. (the "Claimant") filed suit against the Carepoint Entities in the United States District Court for the District of South Carolina (the "Trademark Lawsuit"). A copy of the Trademark Lawsuit is attached hereto as Exhibit 11 and incorporated herein by reference.

36.     The Claimant Carepoint (also using the name "CarePoint") alleges that it is the owner of the registered trademark shown in footnote fifteen below.[14]

37.     In Paragraph 14 of the Trademark Lawsuit, the Claimant alleges that:

"CarePoint's word and design mark. . .bearing the word "CarePoint" has been registered as a trademark with the United States Patent and Trademark Office under U.S. Registration No. 1,854,992 on September 20, 1994, for use in association with consultation in the field of pharmaceutical care in International

---

[14]

Class 42 and U.S. Registration No. 2,470,799 on September 20, 1994, for use in association with providing business and practice management consulting service for pharmacists, physicians and other health care providers in International Class 35; training services for pharmacists and other health care providers in the area of patient care conducted via seminars, workshops and the global computer network in International Class 41; and hearth care services in International Class 42…"

38.     The Claimant alleges that it began using the trademark on August 1, 1992, and that it has extensively and continuously used the trademark since then, without interruption, in connection with providing services to pharmacists, physicians, and other health care providers.

39.     The Claimant alleges that it has developed substantial goodwill associated with the trademark.

40.     As pertinent here, the Claimant alleges that Carepoint Healthcare registered as a limited liability company in Illinois on July 7, 2012.  The Claimant alleges that Carepoint Healthcare provides pharmaceutical, physician, and health care services, and that it uses a substantially similar logo to the Claimant's trademark on its place of business.

41.     The Claimant alleges that Carepoint Georgia registered as a limited liability company in the State of Georgia on September 2, 2015.  The Claimant alleges that Carepoint Georgia similarly provides pharmaceutical, physician, and health care services, and that it uses a substantially similar logo to the Claimant's trademark on its place of business in addition to the word "PHARMACY."

42.     The Claimant alleges that Carepoint Indiana registered as a limited liability company in the State of Indiana on January 9, 2017.  The Claimant alleges that Carepoint Indiana similarly provides pharmaceutical, physician, and health care services, and that it uses a substantially similar logo to the Claimant's trademark on its place of business in addition to the word "PHARMACY."

43.    The Claimant alleges that Carepoint Ohio registered as a limited liability company in the State of Ohio on November 7, 2016.  The Claimant alleges that Carepoint Ohio similarly provides pharmaceutical, physician, and health care services, and that it uses a substantially similar logo to the Claimant's trademark on its place of business in addition to the word "PHARMACY."

44.    The Claimant alleges that Carepoint Texas registered as a limited liability company in the State of Texas on September 2, 2015.  The Claimant alleges that Carepoint Texas similarly provides pharmaceutical, physician, and health care services, and that it uses a substantially similar logo to the Claimant's trademark on its place of business in addition to the word "PHARMACY."

45.    The Claimant alleges that the defendants have used a trademark[15] (the Carepoint Entities' logo[16]) that is substantially similar in appearance, sound, connotation, and commercial impression to the Claimant's registered trademark (described by the Claimant as its "word and design mark").

46.    The Claimant also alleges that the services offered by the Claimant and the Inured are similar in that they involve pharmaceutical, physician and healthcare services.

47.    The Claimant alleges that the Insureds' use of their trademark has caused and will cause consumer confusion and lead consumers to believe that the source of the services provided by the Carepoint Entities is the Claimant.

---



[15]

[16]

48.     The Claimant alleges that there is further confusion to consumers because the Carepoint Entities utilize digital media through the internet to market their services, and their website (www.carepointrx.com) is very similar to the Claimant's website (www.carepoint.com).

49.     The Claimant alleges that the Carepoint Entities have attempted to trade off the goodwill that the Claimant has established in its trademark and have intentionally copied such trademark with the "intent to deceive, mislead, and confuse consumers into believing that [the Claimant] is the source of [the Carepoint Entities'] services or that [the Carepoint Entities'] services are sponsored by, licensed by, or otherwise affiliated with [the Claimant]."

50.     The Claimant has asserted causes of action for: (1) trademark infringement under the Lanham Act (15 U.S.C. § 1114); (2) unfair competition under the Lanham Act (15 U.S.C. § 1125(a)); (3) trademark infringement under South Carolina Code Ann. § 39-15-1160 *et seq.*; (4) trademark infringement under South Carolina common law; (5) unfair competition (by use of the allegedly infringing trademark) in violation of the South Carolina Unfair Trade Practices Act; and (6) unjust enrichment (by use of the allegedly infringing trademark).

51.     The Claimant seeks an award of damages including exemplary damages, treble damages, disgorgement of profits, punitive damages, attorney's fees, and injunctive relief, including: (a) that the Carepoint Entities be permanently enjoined from marketing or selling any services that use the Claimant's trademark and any other mark confusingly similar to the Claimant's trademark; (b) that the Carepoint Entities be permanently enjoined from further marketing and sale of services that use or are packaged with the Claimants' trademark or marks that are confusingly similar to the Claimant's trademark; and (c) that the Carepoint Entities be permanently enjoined from using the Claimant's trademark, and any mark confusingly similar to the Claimant's trademark.

**THE CAREPOINT ENTITIES' USE OF THE ALLEGEDLY INFRINGING LOGO**

52.     Since at least May 27, 2013, the Carepoint Entities have maintained a website at

http://carepointrx.com.

53.     Since at least May 27, 2013, the Carepoint Entities have also used the logo that is

the subject of the Trademark Lawsuit on their website.  A copy of an archived web image of the

Carepoint Entities' website, dated May 27, 2013, is attached hereto as Exhibit 12.

**COUNT I**
**(Declaratory Judgment)**
**NO COVERAGE UNDER THE COMMERCIAL POLICIES**

54.     PhMIC incorporates the allegations in Paragraphs 1 through 53 as though fully set

forth herein.

55.     Based on the aforementioned terms, conditions, and exclusions of the Commercial

Policies and the allegations of the Trademark Lawsuit, there is no potential for coverage for the

Trademark Lawsuit under the Commercial Policies.

**A.     There Is No Coverage Under Coverage L – Bodily Injury Liability and Property Damage Liability**

56.     Coverage L of the Commercial Policies extends coverage only for "bodily injury"

or "property damage" caused by an "occurrence."

57.     The Trademark Lawsuit does not allege "bodily injury" or "property damage"

caused by an "occurrence."

58.     There is thus no coverage for the Trademark Lawsuit under Coverage L of the

Commercial Policies.

59.     Exclusion d. of Coverage L also excludes coverage for "bodily injury" or

"property damage" which is expected by, directed by, or intended by the "insured"; or that is the

result of intentional and malicious acts of the "insured."

60.     Here, to the extent the allegations of the Trademark Lawsuit involve "bodily injury" or "property damage" caused by an "occurrence" (which PhMIC disputes), the Trademark Lawsuit alleges that the Carepoint Entities' conduct was intentional, knowing, and willful, and done with the "intent to deceive, mislead, and confuse consumers."

61.     There is thus no coverage for the Trademark Lawsuit based on Exclusion d. of Coverage L because the Trademark Lawsuit involves conduct which is expected by, directed by, or intended by the Carepoint Entities, or that is the result of intentional and malicious acts of the Carepoint Entities.

62.     Coverage L also extends coverage only for "damages," which is defined by the Commercial Policies as "compensation in the form of money for a person or organization who claims to have suffered an injury."

63.     Here, the Trademark Lawsuit seeks relief that includes exemplary and treble damages, disgorgement of profits, punitive damages, and equitable relief.

64.     There is no indemnity coverage under Coverage L for exemplary and treble damages, disgorgement of profits, punitive damages, and equitable relief, as such do not constitute "damages" as that term is defined by the Commercial Policies.

65.     There is also no indemnity coverage under Coverage L for punitive or exemplary damages pursuant to the Punitive Damages Exclusion Endorsement.

66.     PhMIC therefore does not have any obligation to provide defense or indemnity coverage to the Carepoint Entities in connection with the Lawsuit under Coverage L of the Commercial Policies.

**B.     There Is No Coverage Under Coverage P – Personal and Advertising Injury Liability**

67. Coverage P of the Commercial Policies extends coverage only for "personal and advertising injury."

68. The Trademark Lawsuit asserts claims for trademark infringement, unfair competition, and unjust enrichment, which do not fall within the definition of "personal and advertising injury."

69. There is thus no coverage for the Trademark Lawsuit under Coverage P of the Commercial Policies.

70. Exclusion d. of Coverage P also excludes coverage for "personal and advertising injury" arising out of an act committed by or directed by the "insured" who knew that "personal and advertising injury" would occur as a result of the act.

71. Here, to the extent the allegations of the Trademark Lawsuit involve "personal and advertising injury" (which PhMIC disputes), the Trademark Lawsuit alleges that the Carepoint Entites adopted and used the Claimants "mark" with "full knowledge of [the Claimant's] rights and with the intent to deceive, mislead, and confuse consumers," and further, that the Carepoint Entities' conduct "constitutes intentional and willful unfair methods of competition."

72. There is thus no coverage for the Trademark Lawsuit based on Exclusion d. of Coverage P because the Trademark Lawsuit arises out of an act committed by or directed by the "insured" who knew that "personal and advertising injury" would occur as a result of the act.

73. Exclusion g. of Coverage P also excludes coverage for "personal and advertising injury" arising out of oral or written publication of material that took place prior to the policy period.

74.     Here, to the extent the allegations of the Trademark Lawsuit involve "personal and advertising injury" (which PhMIC disputes), the Carepoint Entities have been using the logo that is the subject of the Trademark Lawsuit since at least May 27, 2013.  [*See* Ex 12.]

75.     There is thus no coverage for the Trademark Lawsuit based on Exclusion g. of Coverage P under any Commercial Policies issued subsequent to the 2012-2013 Policy because the Lawsuit involves oral or written publication of material that took place prior to the policy periods of those policies.

76.     Exclusion m. of Coverage P also excludes coverage for "personal and advertising injury" arising out of any violation of intellectual property rights, including infringement of trademark, trade-secret, or patent rights or copyright.

77.     Here, to the extent the allegations of the Trademark Lawsuit involve "personal and advertising injury" (which PhMIC disputes), the entirety of the Trademark lawsuit is predicated on the Claimant's allegations that the Carepoint Entities have infringed on its trademark.

78.     There is thus no coverage for the Trademark Lawsuit based on Exclusion m. of Coverage P because the Trademark Lawsuit arises out of any violation of intellectual property rights, including infringement of trademark, trade-secret, or patent rights or copyright.

79.     Exclusion o. of Coverage P also excludes coverage for "personal and advertising injury" arising out of using, without permission, the name or product of others on "your" web site, in "your" e-mail address, domain name, or metatags for the purpose of misleading the potential customers of another.

80.     Here, to the extent the allegations of the Trademark Lawsuit involve "personal and advertising injury" (which PhMIC disputes), the Trademark lawsuit alleges that the

Carepoint Entities used the Claimant's "mark" (which includes the Claimant's name) on its website "with the intent to deceive, mislead, and confuse consumers into believing that [the Claimant] is the source of [the Carepoint Entities'] services or that [the Carepoint Entities'] services are sponsored by, licensed by, or otherwise affiliated with [the Claimant]."

81.     There is thus no coverage for the Trademark Lawsuit based on Exclusion o. of Coverage P because the Trademark Lawsuit arises out of using, without permission, the name or product of others on the Carepoint Entities' web site, in the Carepoint Entities' e-mail address, domain name, or metatags for the purpose of misleading the potential customers of another.

82.     Coverage P also extends coverage only for "damages," which is defined by the Commercial Policies as "compensation in the form of money for a person or organization who claims to have suffered an injury."

83.     Here, the Trademark Lawsuit seeks relief that includes exemplary and treble damages, disgorgement of profits, punitive damages, and equitable relief.

84.     There is no indemnity coverage under Coverage P for exemplary and treble damages, disgorgement of profits, punitive damages, and equitable relief, as such do not constitute "damages" as that term is defined by the Commercial Policies.

85.     There is also no indemnity coverage under Coverage P for punitive or exemplary damages pursuant to the Punitive Damages Exclusion Endorsement.

86.     PhMIC therefore does not have any obligation to provide defense or indemnity coverage to the Carepoint Entities in connection with the Lawsuit under Coverage P of the Commercial Policies.

## COUNT II
### (Declaratory Judgment)
### NO COVERAGE UNDER THE UMBRELLA POLICIES

87.     PhMIC incorporates the allegations in Paragraphs 1 through 86 as though fully set forth herein.

88.     Based on the aforementioned terms, conditions, and exclusions of the Umbrella Policies and the allegations of the Trademark Lawsuit, there is no potential for coverage for the Trademark Lawsuit under the Umbrella Policies.

**A.      There Is No Coverage Under Coverage E – Excess Liability**

89.     Coverage E of the Umbrella Policies extends coverage only for "bodily injury" or "property damage" caused by an "occurrence" and "personal and advertising injury" covered by "underlying insurance."

90.     The Trademark Lawsuit does not allege "bodily injury" or "property damage" caused by an "occurrence."

91.     The Trademark Lawsuit also does not allege "personal and advertising injury" because it asserts claims for trademark infringement, unfair competition, and unjust enrichment.

92.     The Trademark Lawsuit is also not covered by "underlying insurance," *i.e.*, the 2018-2019 Policy or the 2019-2020 Policy, as set forth in the Umbrella Policies' declarations pages.

93.     There is thus no coverage for the Trademark Lawsuit under Coverage E of the Umbrella Policies.

94.     Exclusion a. of Coverage E also excludes coverage for injury or damage that is not covered by "underlying insurance" for any reason other than exhaustion of its "limit."

95. The Trademark Lawsuit is not covered by "underlying insurance" for the reasons set forth in Paragraphs 56 through 86 of this Complaint.

96. There is thus no coverage for the Trademark Lawsuit based on Exclusion a. of Coverage E because any injury or damage sustained by Carepoint, Inc. is not covered by "underlying insurance" for any reason other than exhaustion of its limit.

97. Coverage E also extends coverage only for "damages," which is defined by the Umbrella Policies as "compensation in the form of money for a person or organization who claims to have suffered an injury."

98. Here, the Trademark Lawsuit seeks relief that includes exemplary and treble damages, disgorgement of profits, punitive damages, and equitable relief.

99. There is no indemnity coverage under Coverage E for exemplary and treble damages, disgorgement of profits, punitive damages, and equitable relief, which do not constitute "damages" as that term is defined in the Umbrella Policies.

100. PhMIC therefore does not have any obligation to provide defense or indemnity coverage to the Carepoint Entities in connection with the Lawsuit under Coverage E of the Umbrella Policies.

**B.     There Is No Coverage Under Coverage U – Umbrella Liability**

101. Coverage U of the Umbrella Policies extends coverage only for "bodily injury" or "property damage" caused by an "occurrence," or "personal and advertising injury."

102. The Trademark Lawsuit does not allege "bodily injury" or "property damage" caused by an "occurrence."

103. The Trademark Lawsuit also does not allege "personal and advertising injury" because it asserts claims for trademark infringement, unfair competition, and unjust enrichment.

104.     There is thus no coverage for the Trademark Lawsuit under Coverage U of the Umbrella Policies.

105.     Exclusion a. of Coverage U also excludes coverage for "bodily injury" or "property damage" which is expected by, directed by, or intended by the "insured"; or that is the result of intentional and malicious acts of the "insured."

106.     Here, to the extent the allegations of the Trademark Lawsuit involve "bodily injury" or "property damage" caused by an "occurrence" (which PhMIC disputes), the Trademark Lawsuit alleges that the Carepoint Entities' conduct was intentional, knowing, and willful, and done with the "intent to deceive, mislead, and confuse consumers."

107.     There is thus no coverage for the Trademark Lawsuit based on Exclusion a. of Coverage U because the Lawsuit involves conduct which is expected by, directed by, or intended by the Carepoint Entities, or that is the result of intentional and malicious acts of the Carepoint Entities.

108.     Exclusion aa. of Coverage U also excludes coverage for "personal and advertising injury" arising out of an act committed by or directed by the "insured" who knew that "personal and advertising injury" would occur as a result of the act."

109.     Here, to the extent the allegations of the Trademark Lawsuit involve "personal and advertising injury" (which PhMIC disputes), the Trademark Lawsuit alleges that the Carepoint Entities adopted and used the Claimants "mark" with "full knowledge of [the Claimant's] rights and with the intent to deceive, mislead, and confuse consumers," and further, that the Carepoint Entities' conduct "constitutes intentional and willful unfair methods of competition."

110. There is thus no coverage for the Trademark Lawsuit based on Exclusion aa. of Coverage U because the Trademark Lawsuit arises out of an act committed by or directed by the "insureds" who knew that "personal and advertising injury" would occur as a result of the act.

111. Exclusion cc. of Coverage U also excludes coverage for "personal and advertising injury" arising out of oral or written publication of material that took place prior to the beginning of the policy period.

112. Here, to the extent the allegations of the Trademark Lawsuit involve "personal and advertising injury" (which PhMIC disputes), the Carepoint Entities have been using the logo that is the subject of the Trademark Lawsuit since at least May 27, 2013. [*See* Ex 12.]

113. There is thus no coverage for the Trademark Lawsuit based on Exclusion cc. of Coverage U because the Trademark Lawsuit involves oral or written publication of material that took place prior to the policy periods of the Umbrella policies.

114. Exclusion ii. of Coverage U also bars coverage for "personal and advertising injury" arising out of any violation of intellectual property rights, including infringement of trademark, trade-secret, or patent rights or copyright.

115. Here, to the extent the allegations of the Trademark Lawsuit involve "personal and advertising injury" (which PhMIC disputes), the entirety of the Trademark lawsuit is predicated on the Claimant's allegations that the Carepoint Entities have infringed on its trademark.

116. There is thus no coverage for the Trademark Lawsuit based on Exclusion ii. of Coverage U because the Trademark Lawsuit arises out of any violation of intellectual property rights, including infringement of trademark, trade-secret, or patent rights or copyright.

117.    Exclusion kk. of Coverage U also excludes coverage for "personal and advertising injury" arising out of using, without permission, the name or product of others on "your" web site, in "your" e-mail address, domain name, or metatags for the purpose of misleading the potential customers of another.

118.    Here, to the extent the allegations of the Trademark Lawsuit involve "personal and advertising injury" (which PhMIC disputes), the Trademark lawsuit alleges that that the Carepoint Entities used the Claimant's "mark" (which includes the Claimant's name) on its website "with the intent to deceive, mislead, and confuse consumers into believing that [the Claimant] is the source of [the Carepoint Entities'] services or that [the Carepoint Entities'] services are sponsored by, licensed by, or otherwise affiliated with [the Claimant]."

119.    There is thus no coverage for the Trademark Lawsuit based on Exclusion kk. of Coverage U because the Trademark Lawsuit arises out of using, without permission, the name or product of others on the Carepoint Entities' web site, in the Carepoint Entities' e-mail address, domain name, or metatags for the purpose of misleading the potential customers of another.

120.    Coverage U also extends coverage only for "damages," which is defined by the Umbrella Policies as "compensation in the form of money for a person or organization who claims to have suffered an injury."

121.    Here, the Trademark Lawsuit seeks relief that includes exemplary and treble damages, disgorgement of profits, punitive damages, and equitable relief.

122.    There is no indemnity coverage under Coverage U for exemplary and treble damages, disgorgement of profits, punitive damages, and equitable relief, which do not constitute "damages" as that term is defined in the Umbrella Policies.

123.    PhMIC therefore does not have any obligation to provide defense or indemnity coverage to the Carepoint Entities in connection with the Lawsuit under Coverage U of the Umbrella Policies.

### COUNT III
### (Declaratory Judgment)
### NO COVERAGE UNDER THE 2019-2020 CYBER ENDORSEMENT

124.    PhMIC incorporates the allegations in Paragraphs 1 through 53 as though fully set forth herein.

125.    Based on the aforementioned terms, conditions, and exclusions of the Cyber Endorsements and the allegations of the Trademark Lawsuit, there is no potential for coverage for the Trademark Lawsuit under the 2019-2020 Cyber Endorsement.

**A.    There Is No Coverage for the Lawsuit Under Coverage Agreement A – Multimedia Liability Coverage**

126.    Coverage Agreement A – Multimedia Liability Coverage extends coverage only to the extent "multimedia peril(s)" take place or first commence on or after the "retroactive date."

127.    The Trademark Lawsuit alleges that the Carepoint Entities have infringed upon the Claimant's trademark by adopting and using a substantially similar commercial logo, thereby causing economic damages to the Claimant in the form of confusion, mistake, and/or deception with regard to the Claimant's brand.

128.    The Carepoint Entities have been using the subject logo since at least May 27, 2013.  [*See* Ex. 12.]

129.    The retroactive date of the Cyber Endorsements is September 4, 2016.

130.    There is thus no coverage for the Trademark Lawsuit under Coverage Agreement A – Multimedia Liability Coverage because the multimedia perils (*i.e.*, the trademark infringement) did not first commence on or after the September 4, 2016 Retroactive Date.

**B.    There Is No Coverage for the Lawsuit Under Coverage Agreement B – Security and Privacy Liability Coverage**

131.    Coverage Agreement B – Security and Privacy Liability Coverage extends coverage only for a "claim" for an actual or alleged "security and privacy wrongful act" provided that the "security and privacy wrongful act" takes place or first commences on or after the "retroactive date."

132.    The Trademark Lawsuit does not allege a "security and privacy wrongful act" because it asserts claims for trademark infringement, unfair competition, and unjust enrichment.

133.     Even if the Trademark Lawsuit did allege a "security and privacy wrongful act," each and every claim in the Trademark Lawsuit is predicated on the Carepoint Entities' alleged use of a logo that infringes upon the Claimant's trademark.

134.    The Carepoint Entities have been using the subject logo since at least May 27, 2013.  [*See* Ex. 12.]

135.    The Retroactive Date of the Cyber Endorsements is September 4, 2016.

136.    There is thus no coverage for the Trademark Lawsuit under Coverage Agreement B – Security and Privacy Liability Coverage because: (a) the Trademark Lawsuit does not allege a "security and privacy wrongful act"; and (b) the conduct of the Carepoint Entities did not first commence on or after the September 4, 2016 Retroactive Date.

**C.    There Is No Coverage for the Lawsuit Under Coverage Agreement C – Privacy Regulatory Defense and Penalties Coverage**

137.    Coverage Agreement C – Privacy Regulatory Defense and Penalties Coverage extends coverage only for a "claim" for an actual or alleged "security breach" or "privacy breach," provided that the "security breach" or "privacy breach" takes place or first commences on or after the "retroactive date."

138.    The Trademark Lawsuit does not constitute a "claim" under Coverage Agreement C – Privacy Regulatory Defense and Penalties Coverage because it is not a "government investigation" commenced against an "insured" by letter, notice, complaint, or order of investigation.

139.    The Trademark Lawsuit also does not allege a "security breach" or a "privacy breach" because it asserts claims for trademark infringement, unfair competition, and unjust enrichment.

140.     Even if the Trademark Lawsuit did constitute a "claim" for a "security breach" or a "privacy breach," each and every claim in the Trademark Lawsuit is predicated on the Carepoint Entities' alleged use of a logo that infringes upon the Claimant's trademark.

141.    The Carepoint Entities have been using the subject logo since at least May 27, 2013.  [*See* Ex. 12.]

142.    The Retroactive Date of the Cyber Endorsements is September 4, 2016.

143.    There is thus no coverage for the Trademark Lawsuit under Coverage Agreement C – Privacy Regulatory Defense and Penalties Coverage because: (a) the Trademark Lawsuit does not constitute a "claim" for a "security breach" or a "privacy breach"; and (b) the conduct of the Carepoint Entities' did not first commence on or after the September 4, 2016 Retroactive Date.

**D.     There Is No Coverage Under Coverage Agreement I – PCI DSS Assessment Coverage.**

144.    Coverage Agreement I – PCI DSS Assessment Coverage extends coverage only for a "claim" for an actual or alleged "security breach" or "privacy breach," provided that the "security breach" or "privacy breach" takes place or first commences on or after the "retroactive date."

145.    The Trademark Lawsuit does not constitute a "claim" under Coverage Agreement I – PCI DSS Assessment Coverage because it is not a written demand made against an "insured" by an "acquiring bank" or "card association" for a "PCI DSS assessment" due to the "insureds" non-compliance with "PCI Data Security Standards."

146.    The Trademark Lawsuit also does not allege a "security breach" or a "privacy breach" because it asserts claims for trademark infringement, unfair competition, and unjust enrichment.

147.    Even if the Trademark Lawsuit did constitute a "claim" for a "security breach" or a "privacy breach," each and every claim in the Trademark Lawsuit is predicated on the Carepoint Entities' alleged use of a logo that infringes upon the Claimant's trademark.

148.    The Carepoint Entities have been using the subject logo since at least May 27, 2013.  [*See* Ex. 12.]

149.    The Retroactive Date of the Cyber Endorsements is September 4, 2016.

150.    There is thus no coverage for the Trademark Lawsuit under Coverage Agreement I – PCI DSS Assessment Coverage because: (a) the Trademark Lawsuit does not constitute a "claim" for a "security breach" or a "privacy breach"; and (b) the conduct of the Carepoint Entities' did not first commence on or after the September 4, 2016 Retroactive Date.

**E.      There Is No Coverage for the Trademark Lawsuit Based on Exclusion P for the Retroactive Date.**

151.    Exclusion P of the Cyber Endorsements excludes coverage for (a) any actual or alleged "multimedia peril," "security and privacy wrongful act," "security breach," or "privacy breach" that took place or first commenced prior to the "retroactive date"; or (b) any actual or alleged "multimedia peril," "security and privacy wrongful act," "security breach," or "privacy breach,", that took place on or after the "retroactive date," which, together with an actual or alleged "multimedia peril," "security and privacy wrongful act," "security breach," or "privacy breach," that took place prior to the "retroactive date", would constitute related "multimedia perils," "security and privacy wrongful acts," "security breaches," or "privacy breaches."

152.    Here, each and every claim in the Trademark Lawsuit is predicated on the Carepoint Entities' alleged use of a logo that infringes upon the Claimant's trademark.

153.    The Carepoint Entities have been using the subject logo since at least May 27, 2013.  [*See* Ex. 12.]

154.    The Retroactive Date of the Cyber Endorsements is September 4, 2016.

155.    There is thus no coverage for the Trademark Lawsuit based on Exclusion P of the Cyber Endorsements because the Trademark Lawsuit is based upon, arises out of, results from, is in consequence of, or in any way involves: (a) any actual or alleged "multimedia peril," "security and privacy wrongful act," "security breach," or "privacy breach" that first commenced prior to the "retroactive date"; or (b) any actual or alleged "multimedia peril," "security and privacy wrongful act," "security breach," or "privacy breach,", that took place on or after the "retroactive date," which, together with an actual or alleged "multimedia peril," "security and privacy wrongful act," "security breach," or "privacy breach," that took place prior to the "retroactive date", would constitute related "multimedia perils," "security and privacy wrongful acts," "security breaches," or "privacy breaches."

**F.    There Is No Coverage for the Trademark Lawsuit Based on Exclusion A for Prior Awareness.**

156.    Exclusion A of the Cyber Endorsements excludes coverage for any "claim" based upon, arising out of, resulting from, in consequence of, or in any way involving any "multimedia peril", "security and privacy wrongful act", "security breach", "privacy breach", "covered cause of loss", "cyber extortion threat", "act of cyber terrorism", "adverse media report", or "notification" which an "insured" had knowledge of prior to the initial effective date of this Cyber Liability coverage.

157.    The Trademark Lawsuit alleges that the Carepoint Entities adopted and used the Claimants "mark" with "full knowledge of [the Claimant's] rights," and further, that the Carepoint Entities' conduct "constitutes intentional and willful unfair methods of competition."

158.    The Carepoint Entities have been using the subject logo since at least May 27, 2013.  [*See* Ex. 12.]

159.    The initial effective date of this Cyber Liability coverage was September 4, 2016.

160.    There is thus no coverage for the Trademark Lawsuit based on Exclusion A of the Cyber Endorsements because the Trademark Lawsuit is based upon, arises out of, results from, is in consequence of, or in any way involves any "multimedia peril," "security and privacy wrongful act," "security breach," or "privacy breach" which the Carepoint Entities had knowledge of prior to the initial effective date of this Cyber Liability coverage.

**G.    There Is No Indemnity Coverage for Counts 2 or 5 of the Trademark Lawsuit Based on Exclusion H for Unfair Competition.**

161.    Exclusion H of the Cyber Endorsements excludes coverage for any "claim" for unfair competition, price fixing, deceptive trade practices, restraint of trade, or violation of any anti-trust laws.

- 39 -

162.     Counts 2 and 5 of the Trademark Lawsuit assert causes of action for unfair competition.

163.     There is no indemnity coverage for Counts 2 and 5 of the Trademark Lawsuit based on Exclusion H of the Cyber Endorsements because Counts 2 and 5 involves claims of unfair competition, price fixing, deceptive trade practices, restraint of trade, or violation of any anti-trust laws.

**H.     There Is No Indemnity Coverage under Coverage Agreement A or B for Exemplary Damages, Treble Damages, Punitive Damages, Disgorgement of Profits, and Injunctive Relief.**

164.     Coverage Agreements A and B extend coverage only for "damages" and "defense costs."

165.     The Trademark Lawsuit seeks relief that includes exemplary and treble damages, punitive damages, disgorgement of profits, and injunctive relief.

166.     There is no indemnity coverage under Coverage A or B the Cyber Endorsements for exemplary and treble damages, punitive damages, disgorgement of profits, and injunctive relief because such do not constitute "defense costs" or "damages" as those terms are defined by the Cyber Endorsements.

167.     PhMIC therefore does not have any obligation to provide indemnity coverage to the Carepoint Entities under the 2019-2020 Cyber Endorsement for any Claim for monetary awards outside the Cyber Endorsement's definition of "Damages."

168.     Other terms, conditions, and exclusions of the 2019-2020 Cyber Endorsement may offer other coverage defenses to PhMIC, depending on any disclosures made through discovery.  Nothing in this complaint shall be construed as a waiver by PhMIC of any other coverage defenses available under the 2019-2020 Cyber Endorsement or the law, and PhMIC

reserves the right to raise all other policy terms, conditions, and exclusions as defenses to coverage as appropriate.

## COUNT IV
### (Declaratory Judgment)
### NO COVERAGE UNDER THE 2016-2017 CYBER ENDORSEMENT, THE 2017-2018 CYBER ENDORSEMENT, OR THE 2018-2019 CYBER ENDORSEMENT

169.    PhMIC incorporates the allegations in Paragraphs 1 through 53 and Paragraphs 124 through 168 as though fully set forth herein.

170.    For the reasons stated in Paragraphs 124 through 168 of this Complaint, there is no potential for coverage for the Trademark Lawsuit under the 2016-2017 Cyber Endorsement, the 2017-2018 Cyber Endorsement, or the 2018-2019 Cyber Endorsement.

171.    There is also no coverage for the Trademark Lawsuit under the 2016-2017 Cyber Endorsement, the 2017-2018 Cyber Endorsement, or the 2018-2019 Cyber Endorsement because there was no "claim" first made against the Carepoint Entities during those endorsement periods.

172.    Coverage Agreements A, B, C, and I specifically provide that coverage is only triggered if "a 'claim' is first made against the 'insured' during the 'endorsement period.' "

173.    The sole notification provided by the Carepoint Entities to PhMIC was notice of the Trademark Lawsuit filed on September 25, 2019.

174.    There has been no notification to PhMIC of any other written demand for monetary or non-monetary relief, any other civil or arbitration proceeding, or any other written request to toll or waive a statute of limitations; a "government investigation" commenced against an "insured" by letter, notice, complaint, or order of investigation; or a written demand made against an "insured" by an "acquiring bank" or "card association" for a "PCI DSS assessment" due to the "insureds" non-compliance with "PCI Data Security Standards."

175.    Thus, the earliest possible date when a "Claim" could have been first made against the Carepoint Entities under Coverage Agreements A, B, C, and I is September 25, 2019, which is not within the endorsement periods of the 2016-2017 Cyber Endorsement, the 2017-2018 Cyber Endorsement, or the 2018-2019 Cyber Endorsement.

176.    PhMIC therefore does not have any obligation to provide defense or indemnity coverage to the Carepoint Entities under the 2016-2017 Cyber Endorsement, the 2017-2018 Cyber Endorsement, or the 2018-2019 Cyber Endorsement.

177.    Other terms, conditions, and exclusions of the 2016-2017 Cyber Endorsement, the 2017-2018 Cyber Endorsement, and/or the 2018-2019 Cyber Endorsement may offer other coverage defenses to PhMIC, depending on any disclosures made through discovery.  Nothing in this complaint shall be construed as a waiver by PhMIC of any other coverage defenses available under the 2016-2017 Cyber Endorsement, the 2017-2018 Cyber Endorsement, the 2018-2019 Cyber Endorsement, or the law, and PhMIC reserves the right to raise all other policy terms, conditions, and exclusions as defenses to coverage as appropriate.

WHEREFORE, the Plaintiff, Pharmacists Mutual Insurance Company, prays for judgment as follows:

a.    Declaring that PhMIC has no duty under the Commercial Policies to defend or indemnify the Carepoint Entities in connection with the Trademark Lawsuit;

b.    Declaring that PhMIC has no duty under the Umbrella Policies to defend or indemnify the Carepoint Entities in connection with the Trademark Lawsuit;

c.    Declaring that PhMIC has no duty under the Cyber Endorsements to defend or indemnify the Carepoint Entities in connection with the Trademark Lawsuit;

d.      Awarding PhMIC such other and further relief that the Court may deem just and

proper; and

e.      For PhMIC's costs herein expended.

Dated: February 27, 2020

Respectfully submitted,

PHARMACISTS MUTUAL INSURANCE
COMPANY

By:     /s/ Douglas R. Garmager
        Larry A. Hoellwarth
        Sarah A. Johnson
        Douglas R. Garmager
        KARBAL, COHEN, ECONOMOU, SILK
        & DUNNE, LLC
        150 S. Wacker Drive, Suite 1700
        Chicago, Illinois 60606
        Tel:  (312) 431-3700
        lhoellwarth@karballaw.com
        sjohnson@karballaw.com
        dgarmager@karballaw.com